IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE ANTONIO ALIENDRES GARCIA,<br><br>Defendant. | **8:25-CR-190**<br><br><br>**MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS** |

Defendant Jose Antonio Aliendres Garcia is one of 32 defendants charged in a 56-count Superseding Indictment in this case. Filing 172. The Superseding Indictment alleges that the defendants committed multiple "jackpotting attacks" against Automated Teller Machines (ATMs) by using malicious software (malware) to "exploit vulnerabilities" in ATMs and "force the ATMs to dispense cash without debiting an account." Filing 172 at 2. Specifically, the government has charged defendant Aliendres Garcia with eight counts: conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344 (Count I); conspiracy to commit bank burglary and fraud in connection with computers in violation of 18 U.S.C. § 371 (Count II); bank fraud in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2 (Count XVI and Count XVII); bank burglary in violation of 18 U.S.C. § 2113(a) and 18 U.S.C. § 2 (Count XXXIV and Count XXXV); and intentional damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A) and (c)(4)(B) and 18 U.S.C. § 2 (Count LII and Count LIII). Filing 172. On September 17, 2025, the defendant filed a Motion to Suppress seeking to exclude evidence discovered during the defendant's arrest and during a subsequent search of his

cell phone. Filing 115; Filing 116. After holding an evidentiary hearing on the motion, United States

Magistrate Judge Ryan C. Carson filed a Findings and Recommendation and recommended that the

defendant's Motion to Suppress be denied. Filing 316. This matter is now before the Court on the

defendant's Statement of Objections to Judge Carson's Findings and Recommendation. Filing 318.

After reviewing the matter *de novo*, the Court overrules the defendant's Statement of Objections,

adopts Judge Carson's Findings and Recommendation in its entirety, and denies the defendant's

Motion to Suppress.

## I.  BACKGROUND

### A.  Factual Background

The following background information provides context for the Court's ruling on the

defendant's Statement of Objections.[1]

At approximately 11:22 P.M. on April 28, 2025, Deputy Christopher Costa of the Adams

County, Nebraska, Sheriff's Office was parked in his police cruiser facing 14th Street in Juniata,

Nebraska, when he observed a silver Nissan Sentra with a broken passenger side taillight slowly

traveling eastbound on 14th Street. [2] Filing 311 at 15–16; Filing 268 (Exhibit 1 at 3). Although the

speed limit was 40 miles per hour, the silver sedan appeared to be traveling approximately 15 to 20

miles per hour. Filing 311 at 17. As the silver Nissan drove past Deputy Costa's parked cruiser,

Deputy Costa pulled behind the vehicle and proceeded to follow it. Filing 311 at 18. Deputy Costa

did not immediately activate his emergency lights and instead he followed the silver Nissan for

---

[1] The Court has reviewed the exhibits presented at the Motion to Suppress hearing and the transcript of that hearing. Filing 268 (Exhibit List); Filing 311 (Transcript). Judge Carson accurately recounted the evidence received at the hearing in his Findings and Recommendation.

[2] Deputy Costa testified that while the road the silver sedan was traveling on is called 14th Street in Juniata, the same road is called 12th Street outside of Juniata. Filing 311 at 17. Sergeant Mike Poplau later confirmed that 12th Street "is actually 14th Street of Juniata." Filing 311 at 79.

approximately 600 or 700 feet. Filing 311 at 18–19. While he was following the vehicle and without his emergency lights activated, Deputy Costa observed the silver sedan turn southbound on Brass Avenue. Filing 311 at 19. Deputy Costa then turned south on Brass Avenue and as he was doing so, he observed the silver sedan "immediately" turn into a ditch on the west side of Brass Avenue. Filing 311 at 19. The silver sedan came to a complete stop in the ditch, at which point Deputy Costa pulled behind the vehicle and activated his emergency lights. Filing 311 at 19. Deputy Costa noted that sedan came to a stop approximately 60 yards from an Adams County Bank branch which sits at the intersection of 14th Street and Brass Avenue in Juniata, Nebraska. Filing 311 at 16, 19. After pulling behind the vehicle, Deputy Costa noticed that it had a temporary tag from the state of Illinois. Filing 311 at 20. Deputy Costa called in the temporary tag, then he approached the driver's side of the silver sedan and ultimately identified two occupants of the vehicle: Ivan Jose Angulo Flores in the driver's seat and Jose Antonio Aliendres Garcia in the passenger seat. Filing 311 at 22–23. Both occupants provided Deputy Costa with Venezuelan identification cards, and Angulo Flores also presented a New York driver's license. Filing 311 at 22–23. Angulo Flores did not have insurance for the vehicle. Filing 311 at 26.

Because the men spoke primarily Spanish, Deputy Costa used the Google Translate application on his phone to ask the men why they were in Juniata. Filing 311 at 23–24. Angulo Flores, the driver and a codefendant in this case, spoke on behalf of the men and explained that they were traveling from Chicago, Illinois, to Lincoln, Nebraska. Filing 311 at 24. Angulo Flores told Deputy Costa that the men had been in Nebraska for approximately three days and that they had been visiting a friend in Juniata and were heading back to Lincoln. Filing 311 at 24. Deputy Costa explained during the suppression hearing that Juniata is approximately 1.5 hours west of Lincoln and that in order to get to Lincoln from Juniata, a person would have to continue driving east on

14th Street toward Hastings, Nebraska, not turn south on Brass Avenue into Juniata. Filing 311 at 25–26. While Deputy Costa was speaking with Angulo Flores, Deputy Costa observed the following items inside the silver sedan: a black Adidas backpack in the backseat, an olive-green backpack in the backseat, and blue "examiner's gloves" in the cupholder of the center console. Filing 311 at 26. Deputy Costa asked Angulo Flores what was in the backpacks, and Angulo Flores responded that there was a laptop, though Deputy Costa could not recall if Angulo Flores referenced a specific backpack. Filing 311 at 28. Aliendres Garcia, the passenger and the defendant in this matter, did not initially say anything about the backpacks. Filing 311 at 28.

During the suppression hearing, Deputy Costa testified that nature of the stop, the time of the evening, Angulo Flores's reference to a laptop in one of the backpacks, and Deputy Costa's prior experience with an ATM jackpotting case earlier in the year caused Deputy Costa to develop reasonable articulable suspicion to detain the men for further investigation. Filing 311 at 26–29. Those facts also prompted Deputy Costa to request that Sergeant Mike Poplau of the Adams County Sheriff's Department report to the scene, which he did approximately 20 minutes after the initial stop. Filing 311 at 27, 77. Both Deputy Costa and Sergeant Poplau testified about a case that they had worked on in February of 2025 involving ATM jackpotting. Filing 311 at 27, 77. In the February 2025 case, an ATM at the Adams County Bank branch in Juniata was breached, resulting in the theft of more than $20,000. Filing 311 at 29, 77. Deputy Costa provided the following information about the February 2025 incident. First, Deputy Costa explained that he had made initial contact with three subjects in a vehicle that was later identified as being involved in the February theft. Filing 311 at 29–30. At the time, Deputy Costa was unaware of the theft and had interacted with the subjects for an unrelated reason. Filing 311 at 29. The day after Deputy Costa's initial contact with the subjects, he learned that money had been stolen from the Juniata branch of Adams County Bank and that the

individuals he had previously interacted with were allegedly responsible for the theft. Filing 311 at 30. Deputy Costa testified that he spent his shift reviewing surveillance cameras and was eventually able to determine the make and model of the vehicle involved in the incident. Filing 311 at 30. He also noted identifying decals on the vehicle, as well as the fact that the vehicle had in-transit plates from Texas. Filing 311 at 31, 39. Later in that shift, which was the day after the theft had occurred, Deputy Costa located the vehicle traveling eastbound on 12th Street in Hastings and attempted to conduct a traffic stop. Filing 311 at 30. The vehicle fled, but Deputy Costa was eventually able to stop the vehicle and arrest three individuals. Filing 311 at 30. Sergeant Poplau transported one of the arrested individuals and later discovered a set of keys that the individual had left inside the prisoner compartment of the police vehicle. Filing 311 at 77, 89, 92, 95. Sergeant Poplau testified that the keys unlocked the ATM at the Juniata branch of Adams County Bank and the ATM at the Adams County Bank branch in Kenesaw, Nebraska, which is a town located approximately 10 minutes west of Juniata and is accessible via 12th Street. Filing 311 at 17, 85, 92. As part of their investigation into the February 2025 incident, both Deputy Costa and Sergeant Poplau became familiar with ATM jackpotting attacks. Filing 311 at 31–32, 77, 94. Specifically, Deputy Costa testified that he learned that jackpotting attacks typically involve crews of multiple individuals operating in a vehicle with a driver acting as a lookout while the passengers use tools including laptops, wireless keyboards, and hard drives to manipulate ATMs and extract cash. Filing 311 at 27, 31–32.

In light of all this and believing he possessed enough reasonable articulable suspicion to detain Angulo Flores and Aliendres Garcia for further investigation, Deputy Costa asked the men to step out of the silver sedan. Filing 311 at 28–29. Deputy Costa received consent from both men to search the backpacks located in the backseat of the vehicle. Filing 311 at 32. Aliendres Garcia

told Deputy Costa that the green backpack was his, while Angulo Flores claimed the black backpack. Filing 311 at 32–33. Deputy Costa located various items of clothing within the green backpack, and he found a laptop computer, a wireless keyboard, three SSD hard drives, a wireless internet hot spot, and various other computer equipment pieces within the black backpack. Filing 311 at 33. Deputy Costa testified that based on the distribution of items between the two backpacks—only clothing and toiletries in the green backpack and only computer equipment in the black backpack—it was his belief that the backpacks were not solely attributable to the men who claimed them. Filing 311 at 33–34. Deputy Costa also received consent to search the vehicle, at which point he discovered one pair of blue nitrile gloves[3] located in a cupholder in the center console, a screwdriver located in a cupholder in the center console, an empty cellophane package of a ten-pack of gloves located in the backseat, and another screwdriver located in the backseat. Filing 311 at 32, 34–35.

At some point, Sergeant Poplau arrived at the scene, but he did not remain there for long and he did not make contact with either occupant of the silver sedan.[4] Filing 311 at 36, 79. After learning the details of the stop from Deputy Costa and after hearing Deputy Costa's general belief that the stop could be related to the February jackpotting incident, Sergeant Poplau walked over to the Juniata branch of Adams County Bank to inspect the ATM. Filing 311 at 79–81. Sergeant Poplau testified that he found the Juniata ATM to be "unlocked." Filing 311 at 81. He then drove to the

---

[3] A more thorough search was later conducted pursuant to a search warrant, and three pairs of blue nitrile gloves were ultimately located in the center console of the vehicle. Filing 311 at 34–35.

[4] Deputy Costa testified that he believed he had already asked the men to exit their vehicle by the time Sergeant Poplau arrived on scene, while Sergeant Poplau testified that he believed the men were still in their vehicle when he arrived. Filing 311 at 28, 78–79.

Kenesaw branch of Adams County Bank to inspect that ATM and similarly found it to be "unlocked."[5] Filing 311 at 81.

After Sergeant Poplau noticed the Juniata ATM was unlocked, he asked someone at the sheriff's office to contact Adams County Bank personnel. Filing 311 at 81. After multiple unsuccessful attempts to reach bank personnel, Sergeant Poplau himself drove to the bank president's house in Kenesaw and informed him that both ATMs were unlocked. Filing 311 at 81–82. The bank president, Neel Keiser, told Sergeant Poplau that the ATMs should not have been unlocked, and he met Sergeant Poplau at the Kenesaw branch where they reviewed surveillance footage taken from approximately 10:00 P.M. to 11:30 P.M. on April 28, 2025, at both the Kenesaw and Juniata ATMs. Filing 311 at 82–83. Sergeant Poplau did not observe any vehicles approaching either branch of the bank. Filing 311 at 83. Sergeant Poplau relayed his findings to Deputy Costa, who ultimately arrested Angulo Flores and Aliendres Garcia based on his belief that they were involved in criminal activity. Filing 311 at 37, 84. Deputy Costa transported the men to the Adams County Jail, while Sergeant Poplau—who had by that time returned to the scene of the traffic stop—escorted the silver sedan to the Adams County Sheriff's Department's storage building. Filing 311 at 38, 84–85. Deputy Costa testified that he seized Angulo Flores's and Aliendres Garcia's cell phones but that the Federal Bureau of Investigation (FBI) quickly became involved and he believed the FBI booked the cell phones into evidence. Filing 311 at 38–39.

---

[5] On cross-examination, Sergeant Poplau explained that the ATMs contained twisting mechanisms that, if twisted, caused the ATM door to be opened. Filing 311 at 87. The twisting mechanisms have locks that require a key, and Sergeant Poplau found that both the Juniata and Kenesaw ATMs were unlocked. Filing 311 at 87–88. Sergeant Poplau did not observe any evidence of forced entry into the ATMs. Filing 311 at 87.

### B.   Procedural Background

On May 20, 2025, United States Magistrate Judge Michael D. Nelson signed a search warrant authorizing the Government to search the two cell phones seized from Angulo Flores and Aliendres Garcia, the defendant in this matter. Filing 268 (Exhibit 1). Agent Brandon Stigge, a Task Force Officer with the FBI, provided an affidavit in support of the search warrant application. Filing 268 (Exhibit 1). Agent Stigge's affidavit discussed the April 28, 2025, stop and eventual arrest of the defendant and Angulo Flores, and it explained the nature of jackpotting attacks. Filing 268 (Exhibit 1 at 3–5). Agent Stigge referenced an April 29, 2025, search of the silver Nissan Sentra which was conducted pursuant to a search warrant and which allowed Adams County deputies to confirm that the vehicle had been connected to prior ATM thefts involving multiple subjects in Appanoose County, Iowa, and Bates County, Missouri, based on the fact that the silver vehicle had the following identifying markers: a temporary license plate number of 012541A67, an Apple sticker in the upper rear driver side back window, a decal on the gas tank lid, and a tennis ball visible under the middle of the spoiler on the trunk lid. Filing 268 (Exhibit 1 at 6–7). The affidavit explains that only the black Adidas backpack, which had a pink star and the number "5" on it, was entered into evidence. Filing 268 (Exhibit 1 at 6). That backpack, along with the silver Nissan Sentra, can be seen in surveillance images from the prior ATM theft in Appanoose County, Iowa. Filing 268 (Exhibit 1 at 10–11). Agent Stigge explains in the affidavit that an FBI agent interviewed both Angulo Flores and the defendant. Filing 268 (Exhibit 1 at 12). While Angulo Flores admitted that he had conducted reconnaissance on multiple ATMs in various states and had taken a picture of the Juniata ATM, the defendant claimed that he was unaware of the ATM incidents and that he had driven from Chicago to Nebraska to assist Angulo Flores with a stalled vehicle and that they were in Juniata to "pick up some women." Filing 268 (Exhibit 1 at 12–13).

Following the grant of the search warrant, the defendant's black Samsung cell phone was searched, and the Government asserts that it found incriminating evidence on the cell phone. Filing 159 at 3. On May 7, 2025, the Government filed a criminal complaint against the defendant and Angulo Flores in case number 8:25cr111.[6] Judge Nelson held a preliminary hearing on May 14, 2025, and found that there was probable cause to believe that the defendant had committed the crimes alleged in the complaint. Filing 268 (Exhibit 101). The grand jury then returned an Indictment in the present case, Filing 5, on August 19, 2025, and a Superseding Indictment, Filing 172, on October 21, 2025. Prior to the return of the Superseding Indictment, the defendant filed a Motion to Suppress "any evidence resulting from [h]is unlawful arrest and/or the search of a Black Samsun[g] cellular telephone seized attendant to the arrest." Filing 115 at 1. In his motion and supporting brief, the defendant argues that Deputy Costa lacked probable cause to arrest the defendant because there was "[n]o evidence particular to" the defendant in the silver vehicle. Filing 115 at 2; Filing 116 at 3. The defendant argues that the "discovery of any incriminating evidence found in" the defendant's cell phone therefore "resulted from his unlawful arrest." Filing 115 at 2. The defendant also contends that "the facts set forth in Agent Stigge's warrant application were plainly deficient to establish probable cause." Filing 116 at 4. Finally, the defendant argues that the good faith exception to the Fourth Amendment's exclusionary rule, set forth in *United States v. Leon*, 468 U.S. 897 (1984), does not apply here. Filing 116 at 3–4. The Government filed a response to the defendant's Motion to Suppress, Filing 159, and Judge Carson held an evidentiary hearing on the motion on December 1, 2025. Filing 265 (Text Minute Entry); Filing 311 (Transcript).

---

[6] Case number 8:25cr111 has since been dismissed, as the defendant and Angulo Flores were both indicted in the present case, 8:25cr190.

In a Findings and Recommendation filed on January 8, 2026, Judge Carson recommended that the Court deny the defendant's Motion to Suppress. Filing 316. The defendant has filed a Statement of Objections to Judge Carson's Findings and Recommendation, Filing 318, and his arguments have been fully briefed. *See* Filing 322 (Defendant's Brief in Support of Statement of Objections); Filing 342 (Government's Response); Filing 354 (Defendant's Reply).

## II.   ANALYSIS

### A.   Standard of Review

Under the Federal Rules of Criminal Procedure, the Court "must consider de novo any objections to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." 28 U.S.C. § 636(b)(1); *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) ("When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections[.]"). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[ ] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally

meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law[.]'"). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008).

### B.  Objections Related to the Arrest

#### 1.  *The Magistrate Judge's Findings and the Parties' Arguments*

The defendant first objects to Judge Carson's findings regarding the defendant's warrantless arrest. Filing 318 at 2. After considering the totality of the circumstances before law enforcement on the night of April 28, 2025, and into the early morning hours of April 29, 2025, Judge Carson concluded that there was sufficient probable cause to arrest the defendant. Filing 316 at 7–8. In reaching this conclusion, Judge Carson found that the facts of the defendant's arrest were more similar to the facts in *Maryland v. Pringle*, 540 U.S. 366 (2003), than to the facts in *Ybarra v. Illinois*, 444 U.S. 85 (1979). Filing 316 at 7.

The defendant has raised three objections to Judge Carson's findings about the arrest. First, the defendant objects to Judge Carson's reliance on *Pringle* instead of *Ybarra* or an even older case, *United States v. Di Re*, 332 U.S. 581 (1948). Filing 318 at 2. Second, the defendant objects to the Findings and Recommendation "to the extent it credits Deputy Costa's testimony that it was suspicious that [the defendant's] bag had normal clothing and toiletry items while [Angulo Flores's] backpack did not," and to the extent it concludes that the Deputy Costa "'reasonably believed one

backpack contained personal items of both [Angulo Flores and the defendant], and they each also had control over the backpack with the electronics.'" Filing 318 at 2 (quoting Filing 316 at 7). Third, the defendant objects to Judge Carson's conclusion that, "[b]ased on the totality of the circumstances, including Costa's prior experience with these types of thefts, the electronic equipment found within the vehicle, and knowledge that two nearby ATMs were 'unlocked' without authorization, it is reasonable that Costa had sufficient information to believe that a crime had been committed and that Defendant was involved in that crime." Filing 318 at 2 (quoting Filing 316 at 8). The Government responds that *Pringle* is more probative in this case than either *Ybarra* or *De Ri*, and it argues that under the totality of the circumstances, Deputy Costa possessed sufficient probable cause to arrest the defendant. Filing 342 at 2–3.

### 2. Applicable Standards

"Under the Fourth Amendment, a warrantless arrest must be based on probable cause." *United States v. Welch*, 951 F.3d 901, 905 (8th Cir. 2020). "Probable cause exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Willis v. Mills*, 141 F.4th 905, 911 (8th Cir. 2025) (internal quotation marks and citations omitted) "To determine if there is probable cause, courts must examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (internal quotation marks and citations omitted). "Because probable cause is a practical and common-sensical standard, an officer may draw inferences based on his own experience to determine whether probable cause exists." *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (internal quotation marks and citations omitted). Probable cause also exists "when, at the moment of the arrest, the collective knowledge of the officers involved was sufficient to warrant a

12

prudent man in believing that the [defendant] had committed or was committing an offense." *Welch, 951 F.3d at 905* (internal quotation marks and citations omitted). In short, "[p]robable cause depends on the totality of the circumstances." *Id.*

Based on the parties' arguments and Judge Carson's findings, the Court considers three Supreme Court cases in determining whether there was probable cause to arrest the defendant. The Court will address the cases in order of oldest to newest, beginning with *United States v. Di Re*, a 1948 Supreme Court case that the defendant argues "demonstrate[s] that probable cause to arrest and/or search an individual must be particularized to that individual; mere proximity to criminal activity alone is insufficient to establish probable cause." Filing 322 at 4. The defendant in *Di Re* was a passenger in a vehicle that police suspected was the site of an illegal sale of counterfeit gasoline ration coupons. *Di Re,* 332 U.S. at 583. The vehicle's two other occupants were the informant who had tipped off the police to the sale and the seller himself. *Id.* Prior to the stop, law enforcement had no information about Di Re, the defendant. *Id.* at 593–94. Di Re and his companions were taken into police custody, where it was ultimately discovered that Di Re had one hundred counterfeit gasoline ration coupons on his person. *Id.* at 583. The Supreme Court held that the arrest and search of Di Re were illegal and were not justified as incident to the search of the seller's vehicle. *Id.* at 587. The Supreme Court explained that it was "not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." *Id.* In rejecting the government's argument that Di Re's arrest was lawful because the arresting officer had "probable grounds to believe" Di Re was involved in a conspiracy with the vehicle's other passengers, the Supreme Court noted that there was "no evidence that it [was] a fact or that the officers had any information indicating that Di Re was in the car when [the informer] obtained ration coupons from [the seller], and none that he heard or took part in any

conversation on the subject." *Id.* at 592–93. Thus, the *Di Re* court explained, "[a]n inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case," including the fact that the informer "pointed out" the seller only "as a guilty party." *Id.* at 593–94. The Supreme Court cautioned that "[p]resumptions of guilt are not lightly to be indulged from mere meetings." *Id.* at 593.

The defendant also argues that *Ybarra v. Illinois*, a Supreme Court case from 1979, supports the conclusion that his warrantless arrest was unlawful. Filing 322 at 3. The defendant in *Ybarra* was present at a public tavern when police officers executed a search warrant on the tavern. *Ybarra*, 444 U.S. at 87–88. The search warrant authorized the search of the tavern and of a bartender named Greg, who police suspected of possessing heroin. *Id.* When law enforcement officers executed the search warrant, one of the officers frisked each of the customers in the tavern, including Ybarra. *Id.* at 88. As the result of two "frisks" of Ybarra, the officer discovered that Ybarra possessed heroin. *Id.* at 89. The Supreme Court found that the searches of Ybarra and the seizure of heroin were unconstitutional. *Id.* at 96. The Supreme Court determined that the search warrant issued for the tavern and for Greg the bartender did not give law enforcement "probable cause to believe that any person found on the premises" of the tavern aside from Greg "would be violating the law." *Id.* at 90. Furthermore, the *Ybarra* court concluded, "[n]ot only was probable cause to search Ybarra absent at the time the warrant was issued, it was still absent when the police executed the warrant," given that when the agents entered the tavern, they "knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when police had reason to believe that the bartender would have heroin for sale." *Id.* at 90–91. The Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," and "[w]here the standard is

14

probable cause, a search or seizure of a person must be supported by probable cause particularized to that person." *Id.* at 91. "This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.*

Finally, the Court considers *Maryland v. Pringle*, a 2003 Supreme Court case that Judge Carson found to be more applicable to the defendant's case and that the Government argues this Court should also apply. Filing 316 at 7; Filing 342 at 1–2. Similar to the facts in *Di Re*, the defendant in *Pringle* was one of three men in a vehicle stopped by the police. *Pringle,* 540 U.S. at 367–68. During the traffic stop, the officer noticed a large amount of rolled-up money in the vehicle's glove compartment, which was located directly in front of Pringle who was sitting in the front passenger seat. *Id.* at 368. The officer received consent from the driver to search the vehicle and discovered $763 in the glove compartment and five plastic glassine baggies of cocaine behind the backseat armrest. *Id.* The officer questioned the three men about the drugs and money, and after no one offered any information, the officer arrested the three men. *Id.* at 368–69. The Supreme Court found that there was sufficient probable cause to arrest Pringle without a warrant. *Id.* at 369. Although the cocaine was found in the backseat of the vehicle and Pringle was riding in the front passenger seat, the Supreme Court concluded that it was "an entirely reasonable inference from" the facts of the arrest—including the fact that the rolled-up cash was in the glove compartment directly in front of Pringle, the fact that Pringle was one of three men riding in the car at 3:16 a.m., and the fact that the cocaine was accessible to all three men and none of them offered any information regarding its ownership—"that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* at 372. The *Pringle* court rejected "Pringle's attempt to characterize this case as a guilt-by-association case," and it distinguished Pringle's circumstances

15

from those in *Ybarra* and *Di Re*. *Pringle*, 540 U.S. at 372–73. Unlike *Ybarra*, "Pringle and his two companions were in a relatively small automobile, not a public tavern." *Id.* at 373. The *Pringle* court found that "it was reasonable for the officer to infer a common enterprise among the three men." *Pringle*, 540 U.S. at 373 ("[A] car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999))). Unlike *Di Re*, where an informant told police he was going to receive counterfeit gasoline ration coupons from a specific man at a particular place, Pringle's case involved "[n]o such singling out," as "none of the three men provided information with respect to the ownership of the cocaine or money." *Id.* at 373–74.

    3.  *Analysis*

    Although the defendant has identified three objections to Judge Carson's findings regarding the defendant's arrest, those objections are all based on the same argument: that because Angulo Flores claimed ownership of the black backpack containing electronic equipment, there was no probable cause particularized to the defendant to support his arrest and the defendant was instead arrested because of his "mere association" with Angulo Flores. Filing 322 at 3. The defendant's "attempt to characterize this case as a guilt-by-association case is unavailing." *Pringle*, 540 U.S. at 372. Unlike in *Ybarra*, where law enforcement "knew nothing in particular about Ybarra, except that he was present" in the tavern, in this case Deputy Costa did know particular things about the defendant by the time Deputy Costa arrested the defendant. *Ybarra*, 444 U.S. at 91. For instance, Deputy Costa knew that the defendant was one of two men riding in a Nissan Sentra at 11:22 p.m., and that the Sentra had a cracked taillight and was traveling below the speed limit in a direction that was inconsistent with the explanation Angulo Flores gave Deputy Costa on the night of the arrest.

Deputy Costa knew that both the defendant and Angulo Flores had presented Venezuelan identification cards,[7] and he had watched their vehicle pull into a ditch near the Juniata branch of Adams County Bank even before Deputy Costa activated his emergency lights. Deputy Costa also knew that there were two backpacks, two screwdrivers, at least one pair of blue nitrile gloves, and empty packages of gloves in the vehicle and accessible to both men such that Deputy Costa could reasonably infer that both men exercised dominion and control over the items. The black backpack—which Angulo Flores claimed—contained electronic equipment including a laptop computer, a wireless keyboard, three SSD hard drives, a wireless internet hot spot, and various other computer equipment pieces. The green backpack—which the defendant claimed—contained clothing and toiletries.

Standing alone, many of these facts may not equate to probable cause to arrest the defendant, but "[p]robable cause depends on the totality of the circumstances" and that includes Deputy Costa's own experiences, the collective knowledge of law enforcement involved in the arrest, and the events that led up to the arrest. *Welch*, 951 F.3d at 906; *see also United States v. Valle Cruz*, 452 F.3d 698, 703 ("But we do not look at individual facts in isolation. Instead, as we have said, we consider the totality of the circumstances."). The facts stated above, when taken with Deputy Costa's experience investigating the February 2025 ATM jackpotting case (including his understanding that jackpotting attacks typically involve crews of multiple individuals operating in a vehicle and using tools such as laptops, wireless keyboards, and hard drives) and Sergeant Poplau's report that the ATMs in both

---

[7] In the brief supporting his Motion to Suppress, the defendant argues that the "evidence relied upon by Deputy Costa was limited to Defendant's mere presence in [Angulo Flores's] vehicle (and the fact that he is of Venezuelan decent [sic])." Filing 116 at 2. The Court does not agree with the defendant's characterization of the evidence because as the Court explains in the body of this order, Deputy Costa had probable cause to arrest the defendant based on the totality of the circumstances.

Juniata and Kenesaw were unlocked, supply the something "more" that was missing in *Ybarra*. *See Ybarra*, 444 U.S. at 91 ("But, a person's mere propinquity to other independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person." (emphasis added)). Deputy Costa was also aware that the defendant and Angulo Flores had been traveling together for three days, making it reasonable for him to infer that their presence in the Nissan Sentra that night was more than a "mere meeting[ ,]" *Di Re*, 332 U.S. at 593, and was instead consistent with "a common enterprise," *Pringle*, 540 U.S. at 373. The Court therefore agrees with Judge Carson that the circumstances of the defendant's arrest are more consistent with *Pringle* than either *Ybarra* or *Di Re*, and the Court finds that Deputy Costa had probable cause to arrest the defendant.

Furthermore, the Court finds Deputy Costa's testimony that he believed the green backpack contained the clothing and toiletries for both men while the black backpack contained all of the electronic equipment to be credible. *See* Filing 311 at 33–34. The defendant argues that Deputy Costa's testimony regarding the backpacks was "untenable" and "self-serving" because the green backpack was not logged as evidence and because "Deputy Costa was unable to provide any specific testimony regarding how the contents of [the defendant's] bag belonged to both [the defendant and Angulo Flores.]" Filing 332 at 6. "Probable cause, however, does not require officers to establish the elements of the offense with a level of certainty as though trial-level proof must exist at the side of the road." *United States v. Brooks*, 982 F.3d 1177, 1180 (8th Cir. 2020). Deputy Costa was entitled to draw inferences based on his experiences and those inferences could be "practical and common-sensical." *See Soderman*, 983 F.3d at 375. Through his work on the February 2025 ATM jackpotting case, Deputy Costa learned that jackpotting crews are frequently composed of multiple individuals using the same vehicle and a variety of electronic equipment. This prior experience

likely informed Deputy Costa's belief that the men shared the contents of both backpacks, as did the fact that the men had been traveling together for multiple days meaning they might have each needed to change clothes at some point. *See* Filing 311 at 34. Having considered Deputy Costa's experience and his testimony during the suppression hearing, the Court agrees with Judge Carson that Deputy Costa "reasonably believed that one backpack contained personal items" of both the defendant and Angulo Flores "and that they each also had control over the backpack with the electronics." Filing 316 at 7.

The Court therefore adopts Judge Carson's conclusion that the defendant's arrest was supported by probable cause. The defendant's objections to this conclusion are overruled.

### C.  Objections Related to the Search Warrant

*1.  The Magistrate Judge's Findings and the Parties' Arguments*

The defendant's second set of objections challenges Judge Carson's findings regarding the search warrant issued for the defendant's cell phone. Filing 318 at 3–4. Reviewing the totality of the circumstances, Judge Carson concluded that the search warrant and Agent Stigge's affidavit supporting it were based on sufficient probable cause. Filing 316 at 9–10. Judge Carson further determined that even if the search warrant had been defective, the *Leon* good faith exception applies. Filing 316 at 10. The defendant has raised two objections to Judge Carson's conclusions. First, the defendant argues that "[f]or the same reasons his arrest was unlawful, the search warrant was unsupported by probable cause." Filing 318 at 3. Second, the defendant contends that the *Leon* good faith exception should not apply to the search warrant in this case because "the warrant was plainly deficient" and the "evidence the applicant submitted in support of the warrant contained false statements or omissions made knowingly and intentionally or with reckless disregard for [their] truth." Filing 318 at 3. The Government responds that Agent Stigge's affidavit "speaks for itself and

there is probable cause." Filing 342 at 3. The Government emphasizes that the "Court's review is limited to the four corners of the affidavit, which, at this point, has been found to contain sufficient probable cause by two separate Magistrate Judges—one in issuing the warrant and one in reviewing it in the context of [the defendant's] motion to suppress." Filing 342 at 3. Even if the Court were to find probable cause lacking, the Government argues that the *Leon* good faith exception applies. Filing 342 at 3.

2.    *The Search Warrant Was Supported by Probable Cause*

The Court first considers whether the search warrant for the defendant's cell phone was supported by probable cause and concludes that it was. "The '[i]ssuance of a search warrant must be supported by probable cause.'" *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (quoting *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016)). "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts." *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009) (internal quotation marks and citations omitted). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, we have also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "A supporting affidavit establishes probable cause to issue a search warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.'" *Brackett*, 846 F.3d at 992 (quoting *United States v. Snyder*, 511 F.3d 813, 817 (8th Cir. 2008)). "If the magistrate judge relies solely upon a supporting affidavit to

20

issue the search warrant, a subsequent review of the warrant's validity may only address information which is found within the four corners of the affidavit." *United States v. Davis*, 126 F.4th 610, 615 (8th Cir. 2025) (internal quotation marks and citations omitted).

The Court has reviewed the affidavit submitted by Agent Stigge in support of his application for a search warrant and finds that the affidavit "sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity w[ould] be found" on the defendant's black Samsung cell phone. *Brackett*, 846 F.3d at 992 (internal quotations marks and citation omitted). Many of the same circumstances establishing probable cause to arrest the defendant are reiterated in Agent Stigge's affidavit, including the fact that Deputy Costa encountered the defendant and Angulo Flores during a traffic stop near a branch of Adams County Bank, that a search of their vehicle resulted in the discovery of two backpacks, two screwdrivers, an empty box of blue nitrile gloves, and one pair discarded gloves, and that Sergeant Poplau discovered that the ATMs at the Juniata and Kenesaw branches were unlocked. Filing 268 (Exhibit 1 at 3–4). The affidavit expounds on the general nature of ATM jackpotting attacks, explaining that jackpotting suspects use electronic devices and tools like those found inside the Nissan Sentra to access ATMs and deploy malware and that they use cell phones to retain and exchange large amounts of information. Filing 268 (Exhibit 1 at 14–15). Agent Stigge's affidavit also specifically connects the Nissan Sentra and the black backpack to prior ATM thefts across the Midwest. Filing 268 (Exhibit 1 at 6–12). The affidavit describes *Mirandized* interviews that both Angulo Flores and the defendant gave to law enforcement. Filing 268 (Exhibit 1 at 12–13). In his interview, Angulo Flores admitted to conducting reconnaissance of multiple ATMs, while the defendant claimed in his interview that he was unaware of the ATM incidents and simply traveled from Chicago to Nebraska with Angulo Flores to assist with a stalled vehicle. Filing 268 (Exhibit 1 at 12–13). The defendant

21

informed the interviewing officer that Angulo Flores's had told the defendant that they had traveled from Lincoln to Juniata to "pick up some women," which the affidavit notes is inconsistent with Angulo Flores's initial explanation to Deputy Costa that the men were coming from Chicago to Lincoln. Filing 268 (Exhibit 1 at 13).

Although the defendant did not admit to any involvement in ATM-related activity while Angulo Flores did, the question of whether probable cause exists to support a search warrant depends on the "totality of the circumstances." *Brewer*, 588 F.3d at 1170 (internal quotation marks and citations omitted). Here, Judge Carson correctly concluded that the totality of the circumstances set out above and in Agent Stigge's affidavit supports a finding of probable cause. Contrary to the defendant's claim, the search warrant was not "plainly deficient," and suppression is therefore not warranted. Filing 322 at 8.

### 3. The Leon Good Faith Exception Applies

Even if the Court did not believe there was probable cause supporting the search warrant of the defendant's cell phone, the Court would deny suppression because the *Leon* good faith exception applies. "Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021) (internal quotation marks and citation omitted). "To determine whether an officer had 'an objectively reasonable belief in the existence of probable cause,' this Court assesses 'the totality of the circumstances, including information known to the officer but not presented to the issuing judge.'" *United States v. Norey*, 31 F.4th 631, 635 (8th Cir. 2022) (quoting *United States v. Fiorito*, 640 F.3d 338, 344 (8th Cir. 2011)).

Considering the "totality of the circumstances, including information known to the officer but not presented to the issuing judge," the Court concludes that Agent Stigge had an "objectively reasonable belief in the existence of probable cause." *Norey*, 31 F.4th at 635 (internal quotation marks and citations omitted). Agent Stigge's affidavit thoroughly described the investigation into the defendant and Angulo Flores, and the information about ATM jackpotting attacks known to Agent Stigge and included in his affidavit "reinforces the objective reasonableness of his belief in probable cause" in this case. *Id.* at 636. Additionally, "the issuing judge thought [Agent Stigge's] affidavit included sufficient detail for probable cause purposes, which grants further credence to [Agent Stigge's] reasonable reliance on the affidavit." *Escudero*, 100 F.4th at 969.

As the defendant points out, there are exceptions to the *Leon* good faith exception. Filing 116 at 3–4. That is, there are four situations "in which an officer's reliance on a warrant is not in objective good faith." *Fiorito*, 640 F.3d at 345. Those situations are:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*Fiorito*, 640 F.3d at 345 (internal citations omitted) (emphasis in the original). The defendant argues that the first situation is implicated here, and he sets forth the following five instances of "false statements or omissions" in Agent Stigge's affidavit:

> a. The applicant did not inform the issuing magistrate that evidence suggested the vehicle belonged to its driver, [Angulo Flores];
>
> b. The applicant did not inform the issuing magistrate [Angulo Flores] confessed his involvement subsequent to his arrest but did not implicate [the defendant];

23

c. The applicant did not inform the issuing magistrate none of eight people arrested in connection with the jackpotting scheme had implicated [the defendant]. (Filing 63, p. 20).

d. The applicant did not inform the magistrate that nothing of evidentiary value was found and that Garcia's belongings were booked into property and not logged as evidence.

e. While including information about jackpotting thefts that had occurred in Bates County, Missouri and in Appanoose County and Moravia, Iowa, the applicant did not inform the issuing magistrate that [there was] no investigative information [the defendant] had ever been in those locations. (Filing 63, p. 21).

Filing 318 at 3–4. According to the defendant, Agent Stigge's affidavit supporting his search warrant application "fail[ed] to advise the United States Magistrate Judge of any of the foregoing facts weighing against probable cause." Filing 322 at 10. The defendant argues that the "addition of this information omitted by Agent Stigge would materially change the probable cause calculus made by the magistrate [judge]" in issuing the search warrant. Filing 322 at 11.

The Court notes that the first exception to the *Leon* good faith exception—"when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge," *Fiorito*, 640 F.3d at 345 (internal citations omitted)—is the very issue addressed by a *Franks* hearing. *See Snyder*, 511 F.3d at 816 ("Under *Franks* [*v. Delaware*, 438 U.S. 154 (1978)] and its progeny, a defendant may challenge a search warrant on the grounds that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth."). To receive a *Franks* hearing, "a defendant must make a substantial preliminary showing that there was an intentional or reckless omission from a warrant affidavit that was necessary to the finding of probable cause." *United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) (internal quotation marks and citations omitted). "This substantiality requirement is not

met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *Id.* (internal quotation marks and citations omitted). As Judge Carson stated on the record during the suppression hearing, the defendant has not met the required preliminary showing for a *Franks* hearing.[8] Filing 311 at 100. The Court's review is therefore limited to "information found within the four corners of the affidavit"— information that the Court has already determined provides a sufficient basis for probable cause. *Davis,* 126 F.4th at 615 (internal quotation marks and citations omitted). Still, the defendant asks the Court to consider the transcript of his preliminary hearing as proof that Agent Stigge failed to inform the issuing judge of "facts weighing against probable cause," thereby implicating *Leon*'s first situation apart from the *Franks* context. Filing 322 at 10; Filing 268 (Exhibit 101). The Court has considered the preliminary hearing transcript and concludes that the *Leon* good faith exception would still apply if the search warrant lacked probable cause. Accordingly, the Court adopts Judge Carson's conclusions regarding the search warrant and overrules the defendant's objections to those findings.

### III. CONCLUSION

For these reasons, and upon *de novo* review, the Court agrees with Judge Carson's findings and recommendation that suppression is not appropriate in this case. Accordingly,

IT IS ORDERED:

1. The defendant's Statement of Objections, Filing 318, is overruled;

2. The United States Magistrate Judge's Findings and Recommendation, Filing 316, is adopted; and

3. The defendant's Motion to Suppress, Filing 115, is denied.

---

[8] Defense counsel also stated during the suppression hearing that he was not seeking a *Franks* hearing. Filing 311 at 6–7.

Dated this 12th day of March, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge